# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# GALVESTON DIVISION

| | | |
|---|---|---|
| CAITLYN ROSE EICHMANN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 3:24-CV-106 |
| | § | JURY |
| THE U. OF HOUSTON SYS., *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

**TO THE HON. JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE:**

Plaintiff, Caitlyn Rose Eichmann, files this second amended complaint against defendants, the University of Houston System ("UHS"), and Felipe Eduardo Harker, in response to Defendant UHS' motion to dismiss plaintiff's first amended complaint for failure to state a claim, and for causes of action alleges as follows:

## PARTIES

1. Plaintiff, Caitlyn Rose Eichmann, is an individual who is a citizen of the State of Texas.

2. Defendant UHS has waived service. Any further service required on Defendant UHS may be effectuated through its attorney of record, Evan W. Weltge, by a method permitted by Rule 5 of the Federal Rules of Civil Procedure.

3. Defendant, Felipe Eduardo Harker ("Defendant Harker"), has appeared and answered. Any further service required on Defendant Harker may be effectuated through his attorney of record, James Ardoin, by a method permitted by Rule 5 of the Federal Rules of Civil Procedure.

## JURISDICTION

4. The Court has jurisdiction over the lawsuit because the suit arises under Title IX of the Education Amendments of 1972 to the Higher Education Act of 1965, 20 U.S.C. § 1681(a).

5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state-law claims against Defendant Harker because plaintiff's state-law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant Harker resides in this district and all defendants reside in this state.

## CONDITIONS PRECEDENT

7. All conditions precedent have been performed or have occurred.

## FACTS

8. At all times relevant to this action, plaintiff was a student at the UHS.

9. Under a contract between plaintiff, or her parents acting on her behalf, and Defendant UHS, Defendant UHS undertook to accept plaintiff as a student. As one of the conditions of that acceptance, plaintiff was permitted to reside on Defendant UHS' main campus in a room provided by Defendant UHS at the University Lofts, located at 4200 Martin Luther King Boulevard, Houston, Texas 77204-7004. Defendant UHS charged and received a rental fee for this room.

10. On March 2, 2022, at approximately 5:30 P.M., plaintiff and her friend Sobouh Rahimi were at a coffee shop called "The Nook" across the street from Defendant UHS' main campus. Defendant Harker arrived at The Nook at that time at the invitation of plaintiff. When

he arrived at The Nook, plaintiff invited Defendant Harker to join her and Rahimi and he began conversing with them.

11. Plaintiff had met Defendant Harker while she was touring her then boyfriend, Kenneth Joseph Morrow, around campus. While they were touring, Morrow noticed Defendant Harker skateboarding around campus and taking photographs. Due to their mutual interest in skateboarding, Morrow and Defendant Harker began talking. Plaintiff would see Defendant Harker around campus occasionally after that meeting and they became social acquaintances. However, at no time during their casual friendship did plaintiff have any romantic interest in Defendant Harker.

12. Later that same day, at approximately 7:41 P.M., plaintiff and Defendant Harker accompanied Rahimi to his dormitory room on the fifth floor of the University Lofts to have dinner as Rahimi was an excellent cook. Rahimi served glasses of wine at dinner.

13. Later that evening around 10:00 P.M., after their dinner was complete and Rahimi stated that he had to study for a test he had the next morning, plaintiff accompanied Defendant Harker to his dormitory room on the eighth floor of the University Lofts, room #C811. Once they were in Defendant Harker's room, he began pouring beverages containing Minute Maid Pink Lemonade and Reyka vodka for plaintiff and him to drink.

14. After drinking a pink lemonade beverage prepared by Defendant Harker, plaintiff began to feel uncomfortable being alone with Defendant Harker in his dormitory room, as she felt pressed upon to engage in a romantic relationship with him as kept talking about how his girlfriend had just broken off their long-term relationship and he was feeling lonely. This vibe made plaintiff begin to feel uncomfortable because she had a boyfriend and was not interested in having a romantic relationship with Defendant Harker.

15. Also, around this time, plaintiff began feeling intoxicated and started to black out. However, instead of allowing her to go to her dormitory room, at approximately 3:00 A.M. Defendant Harker forced plaintiff to stagger from the University Lofts to the Gerald D. Hines College of Architecture building on Defendant UHS' main campus.

16. Although plaintiff had no memory of leaving the Lofts, she and Defendant Harker were viewed walking around and eventually entering the south side of the architecture building at approximately 4:46 A.M. Plaintiff, still not being in her right mind and only remembering bits and pieces of events, began sitting by a pond outside the architecture building with Defendant Harker. Defendant Harker then began walking plaintiff back to their dormitory at approximately 5:03 A.M., and they returned to their dormitory at approximately 5:18 A.M. Defendant Harker then forced plaintiff to go back to his dormitory room.

17. By the time they returned to Defendant Harker's dorm room, plaintiff had lost all her memory save for a few flashes of going in and out of consciousness. What plaintiff does remember from that time was Defendant Harker having his hands around her neck, squeezing her neck, and trying to have sex with her. Beyond these images, plaintiff's memory is blank.

18. The next thing plaintiff remembered was waking up in Defendant Harker's bed in a state of complete undress except for her panties. Plaintiff requested Defendant Harker to bring her the black leggings and black and white camisole that she had been wearing the previous evening so she could dress without him observing her in that state.

19. As she was preparing to dress, plaintiff realized that Defendant Harker had sexually assaulted her. Although she became aware that she had sex, she had no memory of consenting to engaging in sexual intercourse with Defendant Harker. Plaintiff quickly dressed and then left Defendant Harker's dorm room feeling shame and disgust due to his actions from the previous

4

night.

20. Plaintiff then made an immediate outcry to Morrow, and her older brother's then fiancé now wife, Sara Jae Eichmann (nee' Wesemann). After making the outcry to Wesemann, Wesemann transported plaintiff to Baylor St. Luke's Medical Center—Houston, located at 1100 Bates Avenue, Houston, Texas 77030, where she received a sexual assault examination performed by Sexual Assault Nurse Examiner Kelsi Richardson.

21. During the SANE examination Richardson observed bruising, scratches, and fingermarks on plaintiff's neck during the SANE examination which were consistent with strangulation. This observation was corroborated by then Cpl. Roland J. Henderson of the University of Houston Police Department's Criminal Investigation Division who later took a detailed recorded statement from plaintiff.

22. Furthermore, during the SANE examination a toxicology report was prepared based on plaintiff's blood alcohol level and her urinary alcohol level from samples taken at noon on March 3, 2022. The toxicology reported reflected plaintiff's BAC at noon to be 0.087 and her urine sample results showed a 0.112 alcohol level at that time, which would have put her far over the legal limit to drive in Texas at the time of her sexual assault by Defendant Harker.

23. On March 3, 2022, a search warrant was served on Defendant Harker for items in his dormitory room and forensic genetic testing was performed on certain items recovered from his dormitory room during the search and from plaintiff's person and certain of her personal items from the night in question.

24. Defendant Harker immediately notified Defendant UHS' Equal Opportunity Services (EOS) office and conferred with Easton Elizabeth Riley. After being made aware of the sexual assault by Defendant Harker, Riley informed plaintiff the EOS would not open an

investigation until plaintiff provided her with a detailed statement reflecting the factual basis of her complaint. In fact, Defendant UHS failed to take any action other than to interrogate plaintiff about whether she had done anything to encourage the assaultive conduct.

25. Plaintiff, who by that time had given a number of detailed recorded statements to law enforcement, requested Riley review her sworn statement provided to Cpl. Roland with the UHPD. Furthermore, plaintiff specifically requested that Defendant UHS commence an investigation immediately, instead of waiting until after the criminal investigation was resolved, but she was not provided any response to her request. However, Defendant UHS' refused to review plaintiff's prior statements and failed to even open an investigation into plaintiff's complaint. Moreover, Defendant UHS failed to take any action to discourage Defendant Harker from continuing to harass plaintiff or to protect her from further contact. Finally, Defendant UHS only concluded its so-called investigation after plaintiff withdrew from Defendant UHS.

26. Specifically, plaintiff informed Riley that even though she had already provided a detailed recorded statement to Defendant UHS' police department, she would have no problem reviewing it with them and would be willing to supplement any further information required of her. Plaintiff even provided Riley with the UHPD investigating officer's contact information. However, plaintiff's meeting with Riley proceeded in a rushed, disorganized and undocumented manner and she was never fully explained her rights and options during that meeting. Importantly, when plaintiff requested Defendant UHS use her prior sworn statements given to UHPD, Riley failed to explain that such a request might hinder Defendant UHS' ability to properly investigate her complaint against Defendant Harker.

27. Thus, on or about April 22, 2022, Defendant UHS ceased any further activity in this matter. However, plaintiff did not have notice of Defendant UHS' deliberate indifference to

6

her sexual assault until she received notice from the UHPD sometime later regarding the EOS office's refusal to do even a cursory investigation.

28. At the time she reported her sexual assault to Riley with Defendant UHS' EOS office, plaintiff also reported Defendant Harker's actions to the supervisor of the University Lofts, and requested remedial action be taken such as removing Defendant Harker from the University Lofts. The supervisor informed her that Defendant UHS' Title IX coordinator's office had not informed her of any concern related to Defendant Harker but that she would transfer plaintiff's complaint to the individual in charge of student safety at the University Lofts for a full investigation into the matter through Defendant UHS' residence life office. However, no remedial action was ever taken in response prior to plaintiff withdrawing from Defendant UHS.

29. Throughout this whole process, Defendant Harker was allowed to remain on campus, with no school-imposed restrictions. Eventually, on or about April 22, 2022, plaintiff observed Defendant Harker for the first time since her sexual assault. Unfortunately, plaintiff was taken aback by her observation as she observed him entering the University Lofts. Thus, plaintiff realized that Defendant UHS had failed to take even the most modest step of forbidding Defendant Harker from coming into contact with plaintiff or doing anything to prevent him from engaging in similar behavior in the future.

30. Seeing Defendant Harker at the University Lofts caused plaintiff serious emotional distress which required her to seek mental health counseling and be prescribed medication. In addition, the mental distress she suffered during this period of time caused plaintiff to be unable to concentrate in her classes resulting in her obtaining low grades for the spring 2022 semester and eventually her withdrawal from Defendant UHS completely causing her degree plan to be lengthened by almost two full years.

31. Specifically, after April 22, 2022, when plaintiff realized that Defendant Harker would not be removed from Defendant UHS or even the University Lofts, plaintiff was unable to psychologically cope with being in an environment near him any longer and eventually was forced to withdraw from Defendant UHS entirely due to her inability to sleep and study that this trauma caused. This withdrawal has resulted in a delay in almost two years for plaintiff in obtaining her undergraduate degree.

32. Thus, this sexual assault had a concrete, negative effect on plaintiff's education or access to school resources, such that it was harassment sufficiently severe or pervasive to create a hostile environment because before her assault, plaintiff was an accomplished student progressing on track to graduate within four years with an excellent grade point average whereas after the assault plaintiff could not concentrate on her studies for almost two years and began experiencing panic attacks.

33. On or about June 2023, the genetic testing results were completed. These results showed that Defendant Harker had made contact with plaintiff's right and left breasts, her right and left neck areas, her black underwear, her green lace bralette (inside the front left and right cups, and bottom band), and had used a condom during the incident. This information led to the arrest of Defendant Harker.

34. Although Defendant UHS' police department recommended criminal charges be brought against Defendant Harker, Defendant UHS EOS office refused to reopen its investigation of Defendant Harker's actions. Even worse, although Defendant UHS was notified in November 2023 that the State of Texas would not be criminally prosecuting Defendant Harker, Defendant UHS did not make plaintiff aware that it would not be taking any remedial action against Defendant Harker until she contacted its Title IX office by telephone at the end of January 2024 and was

informed the situation had been closed.

35. In addition to her lost educational benefits resulting from Defendant UHS' failure to take remedial action against Defendant Harker such as her obtaining low grades in her spring 2022 semester and her withdrawing from her course of study at Defendant UHS, plaintiff has incurred medical expenses from her treatment at Baylor St. Luke's Medical Center--Houston, as well as other collateral expenses of moving out of the University Lofts. Furthermore, plaintiff was forced to engage the Kingwood Counseling Center for therapy too assist her in dealing with being a sexual assault survivor.

### COUNT 1 – SEXUAL ASSAULT BY DEFENDANT HARKER

36. Plaintiff incorporates paragraphs 1 - 35 by reference herein.

37. Defendant Harker made physical contact with plaintiff's sexual organs.

38. Defendant Harker made this sexual contact intentionally or knowingly which was offensive to plaintiff as she had no ability to consent.

39. Defendant Harker knew or reasonably should have believed that plaintiff would regard the sexual physical contact as offensive as he had to use unwanted physical force to complete the sexual assault.

40. Defendant Harker's actions resulted in the following damages: (a) physical pain and suffering; (b) disfigurement; (c) mental anguish and emotional distress in the past and the future; (d) medical expenses in the past and the future; (e) loss of consortium; and (f) loss of educational benefits.

41. Plaintiff seeks damages within the jurisdictional limits of this Court.

42. <u>Exemplary damages</u>. Plaintiff's injury resulted from Defendant Harker's malice, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code

section 41.003(a).

## COUNT 2 – UHS' VIOLATION OF TITLE IX

43. Plaintiff incorporates paragraphs 1 – 35 by reference herein.

44. Plaintiff was a female student protected under Title IX, 20 U.S.C. § 1681(a).

45. Defendant UHS is an educational institution within the meaning of Title IX, is engaged in providing educational services to students and which provides dormitory living for students all the while receiving federal financial assistance.

46. Defendant Harker was a fellow student of plaintiff's who attended Defendant UHS' main campus and resided in its University Lofts dormitory along with plaintiff.

47. Defendant UHS created a sexually hostile educational environment through its discriminatory actions of its failure to provide adequate measures of security, including patrols, locks and reasonable rules and regulations to be observed by the students to prevent student-residents from sexually assaulting other students in its dorms and by failing to investigate plaintiff's allegation of sexual assault or take any remedial action in response to plaintiff's allegation.

48. Furthermore, this sexually hostile educational environment was so severe, pervasive, and objectively offensive as to rise to the level of sexual harassment, because even if there was only a single incident, Defendant Harker's sexual assault of plaintiff rises to the level of sexual harassment as Defendant UOS lack of remedial action required plaintiff to confront Defendant Harker at the Lofts causing here extreme emotional distress. Moreover, this sexually hostile environment deprived plaintiff of educational opportunities and benefits provided by Defendant UHS.

49. Defendant UHS is liable because it was deliberately indifferent to remedying the discriminatory conduct of which it had actual knowledge. Specifically, Defendant UHS failed to perform even the most rudimentary investigation of plaintiff's sexual harassment complaint and failed to ensure she would not be subjected to continuing negative interactions with Defendant Harker and harassment by failing to remove Defendant Harker from her presence and by requiring plaintiff to have to interact with him on a regular basis. Furthermore, Defendant UHS failed to provide any remedial action to plaintiff for the emotional suffering she endured or her loss of educational benefits.

50. Defendant UHS is vicariously liable for Defendant Harker's discriminatory conduct. Specifically, Defendant UHS did not exercise reasonable care to prevent and promptly correct the discriminatory conduct, even though plaintiff took advantage of Defendant UHS' measures designed to prevent and correct such discriminatory conduct by reporting same to Defendant UHS' housing advisor for the University Lofts and to Defendant UHS' Title IX compliance office.

51. Based on Defendant UHS' utter failure to provide any response to plaintiff's complaint of a violation of Title IX, plaintiff suffered a decline in grades, avoidance of social activities on campus, avoidance of certain areas of campus, the loss of financial aid, withdrawal from Defendant UHS altogether, and loss of ability to graduate and earn a living.

52. As a direct and proximate result of Defendant UHS' conduct, plaintiff suffered the following injuries and damages: (a) the loss of her anticipated receipts under her agreement to attend Defendant UHS including but not limited to loss of educational benefits; and (b) consequential losses she incurred because of Defendant UHS' violation of Title IX including but not limited to medical expenses in the past and the future.

## JURY DEMAND

53. Plaintiff asserts her rights under the Seventh Amendment to the Unites States Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues. a jury trial and tenders the appropriate fee with this petition.

## ATTORNEY FEES & COSTS

54. Plaintiff is entitled to an award of attorney fees and costs under Title IX, 20 U.S.C. § 1681(a).

## PRAYER

55. For these reasons, plaintiff asks for judgment against Defendant Harker for the following: (a) the loss of her anticipated receipts under her agreement to attend Defendant UHS including but not limited to loss of educational benefits; (b) consequential losses plaintiff incurred including but not limited to medical expenses in the past and the future; (c) compensatory damages; (d) punitive damages; (e) prejudgment and postjudgment interest on such damages; (f) costs of suit; and (g) all other relief as the Court deems appropriate.

56. Furthermore, plaintiff asks for judgment against Defendant UHS for the following: (a) expectancy damages (benefit of the bargain damages); (b) consequential damages, including but not limited to lost profits, cost of delay in obtaining degree, cost of mitigation, and cost of substitute educational opportunity; (c) attorney fees; (d) prejudgment and postjudgment interest on such damages; (e) costs of court; and (f) all other relief the Court deems appropriate.

Respectfully submitted,

/s/ Mark Aronowitz

MARK ARONOWITZ
State Bar No.: 00793281
S.D. Tex. Id. No.: 20421
P.O. Box 1201
Texas City, TX 77592-1201
Tel.:   (409) 599-6685
Fax:   (281) 715-4284
Email: markaronowitz@hotmail.com

OF COUNSEL:
JULIA CATHERINE HATCHER
State Bar No.: 24004692
S.D. Tex. Id. No.
1622 Campbell Lane
Galveston, TX 77551
Email: juliachatcher@gmail.com

ATTORNEY IN CHARGE FOR PLAINTIFF,
CAITLYN ROSE EICHMANN

## CERTIFICATE OF SERVICE

I certify that on August 19, 2024, a copy of the Plaintiff's Second Amended Complaint was served on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following:

Evan W. Weltge
Attorney in charge for defendant, UHS
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
Tel.:  (512) 463-2120
Fax:   (512) 320-0667
Email: evan.weltge@oag.texas.gov

James Ardoin
Attorney in charge for Defendant Harker
Jimmy Ardoin & Assocs., PLLC
4900 Fournace Pl., Ste. 414
Bellaire, TX 77401
Tel.:  (713) 574-8900
Fax:   (713) 574-1404
Email: jimmy@jimmyardoinlaw.com

I certify that Evan W. Weltge and James Ardoin are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

MARK ARONOWITZ